This court now resumes its session. Yes. Good afternoon. I'm Judge Gould presiding and Judge Bennett and Judge Nelson on the panel will be visible in your screens and we're delighted to hear this interesting case for the state of state of Arizona. We have Drew Enson and for the United States Department of Treasury. We have Daniel Winick. If I will start. So Mr. Enson case is set for 20 minutes per side. And for both you and Mr. Winick, it's obviously a very important case. And if either of you need a little extra time, and you ask for it, I will give it. So Mr. Enson should please proceed for for your challenge. Thank you, Your Honor, and good afternoon. Drew Enson may please the court Drew Enson, Deputy Solicitor General for the state of Arizona. I'd like to reserve five minutes for rebuttal. This case involves potentially one of the most aggressive encroachments by Congress upon the sovereignty of the states in the history of our republic. And it's certainly one of the most ambiguous and cryptic. This court should reverse because the state has standing to challenge the tax mandate now. And because the mandate violates the Constitution. Turning to standing the state has standing on four independent bases. I'd like to focus on two of them now. First, compliance costs. The Secretary never disputes. Can I ask a question about compliance costs out of the gate? What the problem with compliance costs, it seems to me is that most of those are addressed in the regulation. The costs and the regulation, was not had not been passed at the time that the complaint had been filed. So how can you establish standing at the time of the complaint was filed for compliance costs that weren't imposed until later? For several reasons, Your Honor, and I do think that the IFR is validly before you for standing purposes, but focusing on the statute itself, I mean, notably, it's it is an initial matter is in fact, undisputed that we will incur compliance costs. In addition, 42 USC 802 D2 imposes the reporting requirements that require us to report on the state's or territory's tax revenue sources during the covered period. That is the statute itself that's going to require us to have reporting, reporting. And if you think about it, everything else in the tax mandate only requires us to report on our spending. It's only the tax mandate itself that will only conceivably ever require us to file any reports about what we're doing on the tax half of our of our fiscal ledger. And so we think those costs are directly attributable to the tax mandate as a statutory matter. But in addition, this issue of the set of the compliance costs from the IFR was also fully briefed and decided below. And the government notably did not raise any waiver argument then based on the state of the pleadings. And, you know, as an observation about general practice, it's simply not the case that, you know, people would file, you know, dozens of supplemental complaints to take account of every subsequent development. And so where well, no, but standing is different standing, you have to have standing at the time of the complaint, that's pretty well established. Now, maybe some of these others give it to you outside of the IMF. But I think a few, you can't, you can't, standing doesn't go retroactively back to even do an amended complaint. So that's why I asked about the compliance costs. But Mr. Ensign, am I correct that if you have standing on any one of your foregrounds, then you have standing to make your arguments? And you don't need, for example, standing on compliance costs, if you have standing on interference with sovereignty? Absolutely, Your Honor, there are four independent bases for standing, a single one of them will suffice and resolve this court's standing inquiry entirely. So just to save our time, to address the issues of most concern to the panel, why don't I suggest you put compliance costs aside now because of the timing and address the other grounds? Certainly, Your Honor. Second, the state has a constitutional right to clear conditions, which the tax mandate at least arguably violates. The violation of a concrete, personally held constitutional right creates cognizable injury. That's after all, how rights ultimately work. And because standing does not depend on the merits, the state has standing by validly alleging that the tax mandate violates the Constitution by being unconstitutionally ambiguous. You know, notably that both the Southern District of Ohio and the Northern District of Alabama expressly found standing on precisely this basis. The Secretary has... Can I ask a question about that? Because I mean, I take your point. But what's the limiting factor here? If we go to, I mean, any state, if we ruled that way, then any state would be able to challenge any spending clause legislation by just claiming it was unambiguous. And the claim that was unambiguous would inherently give them standing. So how do we distinguish that to say, if we were going to adopt that rule, how would we distinguish that with a limiting principle? Your Honor, I think there's a couple of limiting principles. And the first is the one I just articulated. It has to be a personally held concrete right. And so Arizona is obviously not if Congress offers California condition. And any spending clause like this, it's good. Yeah. But any state would still have standing. California would have standing under your theory. In that case, every state that is affected by a spending clause would inherently have standing. If we take your argument to the logical conclusion. I think that's right, Your Honor. And I think that's ultimately unextraordinary in that ultimately what that thing is. If ever Congress attempts to infringe upon the sovereignty of a state, the state in that instance has standing to challenge whether or not that attempted infringement is valid. And I don't think that that's terribly extraordinary. In other words, Congress can't infringe upon our sovereignty without creating injury to us. And counsel, your argument is that in itself is the limiting principle. And it's based on our federal system and the way the structure and interrelationship between the United States and the states were established in the first place. That's correct, Your Honor. And I think concrete is important here. You know, notably, for example, I think you can contrast this case with the Massachusetts v. Mellon case, for example. And here's how the Supreme Court described that. In the last analysis, the complaint of the plaintiff state that was Massachusetts is brought to the naked contention that Congress has usurped the reserve powers of the several states by the mere enactment of the statute, though nothing has been done and nothing is to be done without their consent. So you can't just bring a freestanding claim that it violates an abstract notion of federalism. But where doctrine establishes with precision that we have a right to clarity in conditions, then the attempted invasion of that specifically held right, which is at a fairly low level of generality, will confer standing upon the states. And that's exactly the reasoning of the Southern District of Ohio and the Northern District of Alabama. And notably, the government only had a reasoning of those two decisions. They just said, you know, it's wrong. You should disregard it. You know, in addition, we have standing based on the coercive force of this money, notably, just as in NFIB. This is about 10 percent of the state's budgets at issue, which in NFIB. But again, let me ask you about that, because then are we setting a rule? I have the same concerns about that theory, because anytime it's 10 percent, is that the limit where it's cognizable? What if it were just one percent? That wouldn't be that wouldn't be coercive. I mean, is there a limit at which it's coercive and therefore you are a state always has standing if it affects if it's just a large amount of money that's being given to the state, they always have standing to challenge provisions that they say are unconstitutional. In the main, your honor, you know, and let me explain a couple of things about that. You know, certainly whether or not a condition crosses the line from, you know, mere permissible inducement to unconstitutional gun to the head, I think NFIB calls it that will ordinarily be a merits question and not a standing one. And so then the question is whether or not the states have alleged a potential violation that goes above that steel bar. Obviously, if it's insubstantial or frivolous, there's just nothing there. It fails as a matter of standing. But much more typically, if there's something that looks like it could be coercive there, the states would have standing to determine, in fact, whether or not that was it was the case. And as a standing matter, or is that would be a merits determination as to whether or not that was inconstitutionally coercive rather than a standing one. And I guess my question, maybe I've misframed it. What's the standard for standing? Any time that the state claims it's coercive, that gives them standing? Or does the court have to look at it and see what the course of effect is? And there's some limit at which they have standing and other limits at which they don't have standing? Your Honor, in the vast majority of cases, there will be standing because it's going to be a merits question as to whether or not it's unconstitutionally coercive. That's simply the nature of the doctrine is ascertaining that line drawing exercise is going to be a merits one, and not one of standing. Now, there will be instances where simply so insubstantial that it fails as a matter of subject matter jurisdiction, that's going to be quite rare. I doubt a state would ever sue on that basis. But there is that theoretical limitation of it. If you're looking at it, and it's just inconceivable to you that it could have a coercive effect, that's going to fail as a matter of subject matter jurisdiction, and not the merits. But if it comes to where you need to make engage in that line drawing exercise, it's going to be a merits question, and the state will have standing to challenge it. And I think it's important to note too, that in NFIB, even though it was a, you know, 7-2 holding that it was unconstitutionally coercive, all nine justices thought standing was sufficiently and frankly, blindingly obvious, such that they didn't, not a single one of them felt the need to expend a single word on the issue of standing. And that was so even though the case was in 2012, for a mandate that wouldn't kick in until 2014. And I don't think it's because the Supreme Court was inattentive to standing. They notably have a whole section of the opinion where they 9-0 reject the argument, the Tax Injunction Act precludes jurisdiction, and they appointed an amici in order to raise that argument. So they were certainly attentive to jurisdictional issues. They just didn't think that, you know, that case was even worthy of focusing on it, let alone having a lurking jurisdictional issue that was actually dispositive to the holding that they reached. I do think it's important to note too, because we do think we have standing based on potential enforcement. But this court has made clear, you know, most recently in the California Trucking Association case that both parties cite, that there needs to be a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement. So operation and enforcement are distinct ways in which we can have injury. And so as to compliance costs, the sovereign injury, and the coercive force, we think that those exist from operation of the statute and do not depend on it. So before you move on to the merits, I appreciate your argument on standing. If we agree with you on standing, should we just remand? I know in your brief, you said we should not do this, but the district court didn't address the merits. Shouldn't we remand this for the district court to address the merits in the first instance? And then after you answer that, you can go on to the merits discussion. No, Your Honor, I don't believe the remand is appropriate. Although the district court disclaims making a merits decision, and in so in a manner that's inescapable. And, you know, I think two places you can see where that merits determination has already been met. You know, first, the district court held outright, the Constitution need only disclose the existence of a condition, and not what the condition actually does. That is a holding about what the Constitution requires. It's not even conceivably a standing question. And so in that posture, where the district court has already given you a merits ground for decision, it would be futile to remand so the district court could simply re-announce that quite incorrect holding again. Second, you saw it in the rejection of compliance costs. The district court did not deny there were costs. And in fact, ER 9, it expected that there would be. It simply said that it could not declare them injurious, I'm paraphrasing, because it was within the secretary's authority. But the secretary has no authority to enforce an unconstitutional law. There's simply no way to read that, other than as an implicit but inescapable determination that the tax mandate is constitutional. And so because the district court has effectively already said the merits, all the while disclaiming authority to do so, a remand would be frankly futile and rather pointless, because the district court has already told you what it would do on remand. And you have that decision in front of you and that reasoning that you can review now. Turning to the merits, and as I was just alluding to, the tax mandate is unconstitutional for several reasons. But most obviously, it fails to provide the requisite clarity in its conditions. The government successfully argued below, as I was just alluding to, that the constitution only demands that Congress disclose the existence of a condition and not what it means at all. But as the statement explained, that rationale is directly contrary to the Supreme Court's holding in Arlington Central, which the secretary simply ignored entirely. You know, that decision would have been an affirmance other than a reversal if you'd only had to go by the existence of the condition and not what it did. And so that is clearly irreconcilable with the district court's decision. So counsel, when we get to merits, I know there's a lot of different arguments here, but one of the concerns I have is it seems like this comes up to us on a facially ambiguous claim. And it doesn't seem to me that many of the cases deal with it on a facial level. Most of the other cases that courts are grappling with are as applied. And I take your that there are certain applications of this statute that could be unconstitutional. But it seems to me there's plenty that would not be constitutional and that what the secretary has done by adopting the regulations is attempting to push enforcement into the unconstitutional realm. Help me understand why we should declare this as facially unconstitutional when there's plausible constitutional interpretations of the statute. Certainly, your honor. And I think for several reasons. And the Southern District of Ohio notably weighs into this and explains why this Salerno test would not be applicable here. You know, as an initial matter, I'll note that the government itself has never drawn a facial versus as applied distinction in its answering brief. And I'm not sure that such an argument is validly preserved and in front of you. Well, hold on. But you're challenging it that's my concern about us addressing this now is there's no you're not challenging. You're not saying there's this one specific act we want to do, but we don't think it's constitutional. You're just saying we want the tax mandate gone. Isn't that inherently a facial challenge to the tax mandate? Yeah, it is, your honor. Although we we have and again, the government's never made this distinction. We do have specific tax cuts of issue that could be analyzed as an as applied manner. I grant you the district court has not analyzed them as such. And so if you thought that as it needed to be applied, if you thought as applied was validly in front of you, it needed to be decided. That is not something the district court has weighed in on. However, I'll point you to the Pennhurst, Dole and NFIB cases. And in each of those cases, it was resolved as a facial matter. And it makes sense. You don't need an application here. Either the statutory language on its face is constitutionally unambiguous, or it's unconstitutional. It does not depend on the application of any particular facts. It simply depends on the text of the statute itself. And so in Pennhurst, the yes, your honor. Counsel, if it's a facial challenge, can't our court construe a statute in a way to make it constitutional? If that can be done without offending the plain language. So for example, here, we, of course, do not want to reach constitutional issues absent necessity. And if the statute was totally unambiguous, we shouldn't go beyond that. But if it is ambiguous, can we construe it in some way that would avoid the constitutional issue and make peace between the state and the US? Unfortunately, no, your honor. This context is distinct from the ordinary constitutional context. In the ordinary context where there's a constitutional challenge to a statute, you would, of course, apply the doctrine of constitutional avoidance. And if there are, if you're selecting between a range of plausible interpretations, and some of them are constitutional and some are not, you simply take the unconstitutional ones off the table, even if they might even be a better reading in the statute. That is not how it works in this particular context. That what the Supreme Court has made clear is that Congress has to provide clear, unambiguous conditions. So the existence of ambiguity doesn't give rise to such that you could apply constitutional avoidance to, you know, purge the unconstitutional ones. The existence of ambiguity itself violates the Constitution. And that's what the Supreme Court held in Pennhurst, for example, it simply jettisoned that entire Bill of Rights, you know, in toto, you know, facially, you know, similarly, the court can consider it in Dole as a facial challenge. Similarly, in NFIB, the Medicaid challenge was facially unconstitutional, there was no attempt to save the aspect that required you to expand it. As to the coercion, as well, they certainly didn't go state by state, and examine the individual circumstances of each state to see if it was coercive, you know, vis-a-vis California or Alabama, or whatever. It simply said as an outright matter, it is unconstitutionally coercive as to all 50 states, and is thus unconstitutional in its entirety. It made no effort to engage in the Solano, no set of circumstances passed. It's simply where Congress transgresses these limitations on the spending clause, particularly where it's apparent from the text of the statute itself. That's the end of the court's inquiry. That's certainly how it operated in Pennhurst. The statute in question simply was out, you know, categorically as an attempt to impose conditions on the state. It was ambiguous, and thus it failed categorically. Okay, thanks, counsel. I may be missing something, but I want to explore one issue. It seems to me, at least as I read the statute, that potential ambiguity rests pretty heavily on the fact that the statute says that if a state directly or indirectly uses the ARPA funds to offset a reduction in state revenues, that then the government can try to get the money back. My question is, would it be permissible for us to construe the statute to say the word indirectly is the cause of mischief, and that it's unconstitutional with that, but constitutional without that? I don't believe so, Your Honor. Certainly in Pennhurst, for example, there was no attempt to save what might have been enforceable. It was purged in its entirety. If the inclusion of directly or indirectly causes the statute to be ambiguous, then states could not knowingly accept the offer. Certainly as an ex post matter, the question is what was presented to the states, not what would courts subsequently reconstrue it to be. If what was presented to the states fails to provide the requisite clarity, then it was unconstitutional when enacted, and certainly we can't go back and unscramble the egg as to whether or not states would certify or pass to be constitutional or it fails. Judge Gould, could I ask a follow-up question? That may be true as to the constitutional claim. What about the declaratory judgment? First of all, the district court didn't address it, I guess because it said there was no standing. I assume the declaratory judgment claim is up before us because the whole thing's been dismissed. Couldn't we do that with the declaratory judgment claim and grant declaratory relief as to part of the statute and not as to the other part of the statute? Your Honor, this is an interesting question. I don't think there's any independent bar in the Declaratory Judgment Act that would preclude you from doing so, but I think the applicable spending conditions doctrine doesn't render that a permissible outcome. I think that as the Supreme Court has articulated it, whatever is unambiguously presented to the states is the only thing they could be bound by, and that's certainly it. It wouldn't have been an acceptable disposition example for Arlington Central for the Supreme Court to say, previously it wasn't clear that you would get expert costs. We're now making that clear as a perspective, forthcoming basis. Now you have sufficient notice, and hence you can choose whether or not you want those funds. That's simply not how the court looked at it. It said that the states could only be bound by what was unambiguously clear to them, and anything beyond that was simply unconstitutional and unenforceable, full stop. Thank you, Your Honors. Thank you, Mr. Anton. Good afternoon, Your Honor, and may it please the court. Daniel Winnick for the federal government. Arizona's facial challenge to the offset provision rests on the fundamentally incorrect premise that the provision can be read to prevent states from cutting taxes. It can't, and to Judge Gould's final question. Counsel, not to cut you off, but that's where I'm struggling. I think it can be interpreted. I don't think that was the intent, but we don't get into that. I mean, as Judge Gould pointed out, it's directly or indirectly. I mean, money is a very fungible object. So if the state is not spending its money to fight COVID, and it's using $4 billion of the federal government's money to fight COVID, the $4 billion it's saving could be used to cut taxes. That would arguably be an indirect use and contrary to the statute. So I'm not sure your argument is as easy as you sort of made it seem. So, Your Honor, let me explain what this statute is really doing, and in doing so, I hope make clear why this is not actually ambiguous in the way Your Honor has suggested. So every state that has a balanced budget amendment, which is with the problem of needing to find a way to offset a revenue loss from a tax cut. So anytime they're considering a tax cut, they have to figure out, is it going to reduce our revenue? And if it is, we have to find a way of paying for that. And that could be from revenue increases due to economic growth, or it could be from increasing other taxes, or it could be from cutting spending. That's the list of options. All this provision is saying is that when a state makes that determination, it can't use the new federal funds to pay for a tax cut it's contemplating. It's perfectly free to cut taxes if it uses its own money to do it. And it can do that again in three ways. With economic growth, it increases its revenue with spending cuts outside the areas where it's spending the federal funds, or with increases to other taxes. The only thing it can't do is use these federal funds for that purpose. So again, this is not an unusual sort of determination. With all due respect, I think Secretary Yellen's sort of acknowledged this problem, which is why they tried to put in the regulation that as long as you don't directly tie it together and you don't say, hey, we're giving you a tax cut because we've got this $4 billion coming from the federal government, then you're in the clear. But that seems to be a very different interpretation. Maybe acceptable, but it seems to be a very different interpretation than the directly or indirectly language that the statute actually uses. So with respect, your honor, I don't think that's correct either as to Secretary Yellen's statements or as to the regulations. So what Secretary Yellen was saying was that there are thorny questions that rise in implementing the provision. So for example, whether to let states rely on projections as to the effects of a tax cut or whether to look to actual effects. I mean, those are the sorts of questions agencies routinely resolve, and it did so here. As to the regulations, and this is quite important, the regulations are entirely consistent with the way I just described the operation of the statute. So what the regulations say is for each reporting period, a state has to identify tax changes it has made. It has to or whether they've in fact reduced its net tax revenue. And then if it has, it has to identify how it's paid for those changes with state funds, which can again be through economic growth, through increases to other taxes, or through spending cuts outside an area of fiscal recovery funds. So the regulations are wholly consistent with our understanding of the statute. Indeed, they flow directly from the plain text of the statute. The secretary hasn't tried to narrow them in in any way. Council, I don't want to interrupt the flow of your argument. But I want to ask you the question. Judge Nelson asked your friend, what is the United States's position as to what we should do if we reject your argument that Arizona does not have standing? If we decide that Arizona does have standing, would the United States prefer to reach the statute first? So I don't think, your honor, we have a preference on that. We haven't expressed a preference. We haven't urged the court that it needs to remand. I also think it would be wholly appropriate if the court thought it was more appropriate for the district court to resolve the merits in the first instance. We do think the district court properly dismissed this case for lack of jurisdiction. And the basic reason for that is that, as I said at the outset, Arizona's claims are all premised on a fundamentally incorrect understanding of what the statute does and without that. So I mean, basically, it sounds to me that even if the United States is not expressly expressing a preference here, it's agreeing with Arizona that much of what the district court did on standing was tied to the merits. And if that's the case, it sounds like it would be, in fact, a better use of everyone's time if we rejected your argument on standing to get to the merits. We certainly agree that the jurisdictional and the merits issues are closely related here. Although what I would emphasize is that it's in no way sort of blending the two to say that there's not jurisdiction here. The basic reason there's not jurisdiction here is that Arizona's constitutional challenges, in other words, the merits of this case, are in effect challenges to a different statute. They are challenges to a different statute. And that's not what this statute is. This statute is a restriction on using this new allocation of federal funds to pay for a tax cut. And so they're... I mean, just coming back, and I guess I'm repeating the same thing, the problem is the directly or indirectly. I would agree with you if it said directly, but the indirectly in the statute is what... I mean, indirectly has to mean something other than directly. What does it mean? Now, maybe your position is that there's enough ambiguity that the secretary can then use the authority to define what indirectly means. But if I were just reading indirectly, I think Arizona has a better claim than you might be giving them credit for. With respect to our... The phrase directly or indirectly does not create two hermetically sealed categories of offsets. That's a phrase Congress uses routinely and used here simply to and most importantly, that it can't be circumvented by a formality. So if the statute didn't say that, a state could possibly have argued that the condition was offended only if the governor got up in front of the cameras and said, great news, we have $2 billion in federal funds. We're going to use that to displace our own spending and use our savings to cut our taxes. And all the phrase directly and indirectly does is make clear that a state can't use that sort formality. That if a state is using the federal funds to displace its own spending in some area and using that money to cut taxes, that's just as much as if it were doing what I said a moment ago, that runs afoul of the condition that the state can't use this money to cut taxes. I don't think that's ambiguous in any way. Mr. Winnick, if you've answered Judge Nelson completely, I have another question for you. And my question may be totally off the wall in light of the briefing and the issues considered below. But my question is this, sort of motivated by the fact that we have a distinguished state of the union. We have a distinguished federal government, both of which are entitled to respect under our constitution in a dispute about, not so much about the substance here, but about whether the statute and regulation are ambiguous. My question, sort of off the wall is, would it be within the power of our court to say that for the treasury to recoup money it claims was used as an offset to tax revenues? It would be required to prove that by clear and convincing evidence. No, your honor. I mean, if that goes to an important point, this is not an as applied challenge to this condition. It is not a challenge to an effort by treasury to recoup funds. If there were such an effort, you know, could a state raise an argument in that case about the standard that must be shown perhaps. But this is quite importantly a facial challenge to the provision. We're not aware of any condition on the use of federal funds that has ever been held facially unconstitutional on the ground that it's ambiguous. And that's for a very case. You don't think that that was a facial challenge? That was coercion, your honor, not ambiguity. There has never been a challenge on ambiguity grounds. And that's quite important because, you know, the Supreme Court in cases like Bennett versus Kentucky Department of Education and this court in cases in Mayweathers has made quite clear that a statute is facially constitutional and we won't even get to what the standard would be in an as applied context. But what is required is simply that Congress clearly established that there is a condition. And Congress has clearly established here the condition that states can't use these federal funds to offset a tax cut. All of these other questions that Arizona has raised go not to that basic nature of the condition. They go to how the condition will be applied in particular circumstances. And that is exactly the sort of thing that is properly resolved in an as prior cases in which ambiguity arguments have prevailed. There's just never been a successful face. Help me understand how that would work. Would they have to pass the law first and then sue? Or could they say, hey, we want to do this? Like, for example, if we were to remand this, could they go to the district court and say, hey, here's a bill that we want to pass? We're afraid of passing it because we don't know what the implications will be. We want declaratory relief that this bill will not violate the tax mandate. Would they would the federal government would you say that that's unripe? Would you would you fight them on their ability to obtain declaratory relief in that instance? So bracketing the question whether they could do it in this case, it might have to be a new case. We agree that they could bring a declaratory judgment action like that if there were actually some concrete plan to pass a tax cut and a means of paying for it. If they thought there was something that Treasury would say runs afoul of this provision, and they don't think it does, they could seek that sort of declaratory relief. And that's a central reason why they haven't done that here, even their declaratory judgment claim. And I haven't focused on it as much. But in your opinion, that's the declaratory judgment claim is still a facial challenge. There's no do we have the ability to treat it as an added supply challenge, and parcel out our view of the the constitutional portions of the statute versus the unconstitutional portions of the statute potentially in the declaratory judgment relief claim? No, Your Honor, I mean, their entire complaint top to bottom is a facial challenge to this statute. And they seek various forms of relief. They seek an injunction against the enforcement of the statute facially, they seek a declaratory judgment that the statute is facially unconstitutional, but there's nothing resembling an as applied challenge in their complaint. And that's because there's nothing to challenge. There's no there's nothing to apply this to. I mean, they mentioned this $1.9 billion tax cut that the legislature passed last year, they don't mention it's never gone into effect. And even if it had gone into effect, they don't, they've never alleged or shown that that tax cut is even going to reduce their tax revenue, much less that they would offset any such reduction with federal funds with these federal funds. And that's why this is also artificial. They're essentially asking this court for a for a an advisory opinion, that if Congress were to pass a different statute than this one, and apply it to different set of circumstances than they have shown here, that some constitutional problem would arise. But there's a reason that these sorts of challenges have arisen in the as applied context, states have waited until there's some concrete dispute, and courts have resolved in that concrete context, whether the state had adequate notice that what it was doing ran afoul of the condition. If I might, although although counsel, I mean, in in, in this particular context, in order to at least arguably get to concrete, they'd actually have to pass a statute that if ran afoul of the condition would make it potentially very materially difficult to fiscally plan. So I mean, that's taken a lot of concrete steps that could significantly harm the interests of the state. I mean, Your Honor, I think this case exemplifies why that isn't so The legislature passed this $1.9 billion tax cut last year. Again, it's never taken effect is but this is this is outside the record, but it's been it's been subjected to a referendum drive. They've had six months in which to bring if they wanted some as applied challenge, saying, here's what we've done, here's how we plan to pay for it. You know, we don't think that runs afoul of the condition and Treasury does. And so, you know, please resolve what it means that they haven't done that. And again, I mean, their their ambiguity point here about what the statute means is, frankly, you know, less an ambiguity point than than a breadth point, you know, that the statute does, as I noted, Congress used the phrase directly and indirectly, to make clear that the condition is a broad one, a state, because money is fungible, a state can't take these federal funds, use them to reduce its own spending, and then use that savings to pay for a tax cut. That's not ambiguous. They just don't like that that's a broad condition. I mean, I take the the United States's basic point here is we're giving the states fair notice, and they can take the money or not take the money or they could pass the bill and challenge it and challenge the condition as as applied. But basically, the government's position is the Congress has the right without running afoul of the Constitution to say to the states, you want the money, you can't use it to cut taxes. Yes. And I would emphasize again, this is not I mean, and this goes a little bit to the coercion point. This is not a case like South Dakota versus Dole, where Congress is saying a state is not entitled to some pot of federal funds unless it does something or refrains from doing something and others fear this is a condition saying you have to use these funds for the purposes we've set forth and you can't use them for other purposes. And the government's position also I take it here is that and it's dollar for dollar. It's not like we're piling on with a penalty of some sort. Of course, the only the only portion of the funds that a state wouldn't retain if it ran afoul of this condition is the portion that it misused. So again, this is just bread and butter of Congress's ability to control the purposes for which states are allowed to spend federal funds that they've been given. Mr. Winnick, let's say the Congress gives funds for other purposes. Let me take to illustrate this case. Let me give you an example. Congress, I think, will give money for disaster relief to a state sometimes because of hurricane and Louisiana or tornadoes in Kansas, let's say. Now, when they've given those kinds of funds, what's the government's standard procedure to make sure the funds they give are used for that purpose? So, Your Honor, I don't know if there's a standard procedure or if there is. I'm not fully equipped to talk about it, but I think it's probably commonplace that where Congress has given states funds that have to be used for a particular purpose. States have to report on how they've used the funds and show that they've used them for that purpose. And that's all the states need to do here. Again, the point of this provision is simply to say, you have to show that you're spending these funds for the list of permitted purposes. And you also have to show that you haven't just spent them for those purposes, but then reduced your own spending in the same areas by the same amount and taken the money that you save of state funds and used it to cut taxes. Because if a state did that, the funds wouldn't actually be achieving the purposes for which Congress appropriated them. And that's why, I don't know that I've spoken to Arizona's coercion claim, but that's why their coercion claim fails on its face. The Supreme Court said in NFIB that Congress has categorical authority to condition the receipt of funds on the states complying with restrictions on the use of those funds. Again, this isn't a some pot of money on a state's doing or not doing something in another sphere. And the question is whether it is permissible encouragement or rises to the level of coercion. This is just Congress saying, we're giving you $4 billion. You have to use those funds in the ways that are allowed, and you can't take them and circumvent that set of permissible uses by essentially laundering them through your permissible use categories, but then using them to cut taxes. I see that my time is running low. If there are no further questions, we'd ask that the district court's judgment be affirmed. Thank you, Mr. Winnick. I have no questions. Any others from the panel? No. Okay, we'll let Mr. Ensign come back for rebuttal. Thank you. Thank you, your honors. If I may, I'd like to make five quick points. I believe my opponent said that the regulation was wholly consistent with what the position of DOJ was in its briefs. That's simply not correct. In their briefs below, they took the position that indirectly was, as an adverb, was incapable of modifying the word offset. And then the IFR's entire premise is that it is capable of modifying it. In their briefs below, they also took the position that in order to violate the tax mandate, you had to engage in volitional use of the funds to violate the tax mandate. The IFR takes the diametrically opposed response. So where you have dueling interpretations within a unified executive, I think that's very powerful evidence that it is not, in fact, an unambiguous statute. Second, I believe my brother suggested that we lack standing because we have, quote, incorrect understanding of the statute. But that's on its face. That is conflating the merits and standing. You cannot determine what this statute means unless you first have standing. And I think that's an important foundational point. As to the facial unconstitutional aspect, I believe they suggested there was never an instance of such. I'd point you the Pennhurst case, that entire Bill of Rights was struck down entirely as to whether or not it could condition the states in any manner. Not a scintilla of that provision of issue was held to bind the states. And so that is a very clear instance where it was struck down facially. You know, as to whether or not we have a concrete plan, I would certainly point to we did pass $1.9 billion in taxes that was fully briefed and decided below. The government notably and tellingly has not disclaimed enforcement. I certainly don't read my opponent to say in any manner that they are disavowing enforcement based on those tax cuts that have already been passed. You know, under multiple cases of this court's jurisprudence, that is a powerful indicator that standing exists. You know, notably, we also sent a letter to the secretary asking her to answer so I don't think there was any clarity that could be obtained that way anyway. And, you know, finally, as a suggestion that we needed to pass a statute in order to have standing, you know, I'd like to close with what the Supreme Court said in Medellin, where threatened action by the government is concerned, we do not require plaintiff to expose himself to liability before bringing suit to challenge the basis for that threat. Dot dot dot, the plaintiff's own action or inaction and failing to violate the law eliminates the imminent threat of prosecution, but does not eliminate article three jurisdiction. Would that still apply if there were a proposed bill, and you sought declaratory relief, the government just said they thought you could have a proposed bill and go seek declaratory judgment relief from a federal court, that wouldn't violate the principle you just read, would it? I believe it would, Your Honor, in that, you know, certainly having a proposed bill is even better than what was at issue in MedImmune. But notably, it was both brief and decided below what the impacts of the tax of Arizona's $1.9 billion tax cuts were. The district court, in fact, decided that that was insufficient to confer standing that was fully before them. So, you know, certainly, too, if you think that this can only be resolved as an as applied matter rather than a facial one, I think you could remand for that to be decided. It was squarely presented to the district court. And I think that would certainly be appropriate because, you know, for example, the word facial or citation to Salerno is simply nowhere to be found in the government's answering brief. So I think if if if you wanted to go down that line, certainly either a remand for that or supplemental briefing would be appropriate, because we certainly did present that $1.9 billion in tax cuts to the district court and the district court held that was insufficient to convey standing either for an injunction or declaratory judgment. Thank you, Your Honors. I have one question. Yes, Your Honor. I want to the federal government gives the state of Louisiana money for hurricane relief to the state of Kansas money for tornado relief. Do you agree that in Louisiana only use that money for remedying damage from hurricanes? Absolutely, Your Honor. And I think there's a good contrast there with the immediately the provision that immediately follows the tax mandate, which simply says you can't spend ARPA funds on pensions. That's very simple. That's unconstitutional. That is constitutionally unambiguous. We have no trouble with that. It is all the additional language that is in notable contrast to that that pension provision that causes this the unconstitutionally ambiguous infringe upon it. We should be clear about the stakes here. They're not just directing us to spend money on these four buckets. The federal government is attempting to encumber fully one half of the state's fiscal ledgers by imposing a one way ratchet on our taxing policy. That is not a mere restriction on the funds, you must spend them these, you know, in these four ways. That is what is unconstitutional about it. And their inability to describe that in any way that, you know, coherent is what makes it unconstitutionally ambiguous. But absolutely much like Yes, Your Honor. Oh, I was just gonna say thank you. Thank you, Your Honor. Okay, so I want to and the parties will hear from the court in due course. This case is now submitted and the court will adjourn for the day. Hello. This court for this session stands adjourned.
judges: GOULD, BENNETT, NELSON